**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **DAVID J. JENKINS,** ) | **CASE NO.  4:09 CV 637** |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | **JUDGE DONALD C. NUGENT** |
| ) | |
| **ROBERT WELCH, WARDEN,** ) | **Magistrate Judge George J. Limbert** |
| ) | |
| Respondent. ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Report and Recommendation issued by Magistrate Judge George J. Limbert (Docket #13).  Petitioner David J. Jenkins ("Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Docket #1.)  The Magistrate Judge recommends that the Petition for Writ of Habeas Corpus filed by Petitioner pursuant to 28 U.S.C. § 2254 (Docket #1) be dismissed, in its entirety, with prejudice.

**Factual and Procedural Background**

As set forth by the Magistrate Judge, the factual and procedural history of this case is as follows:

> The Eleventh District Court of Appeals of Ohio set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct", and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999).

As set forth by the Eleventh District Court of Appeals, the facts are:

> {¶ 2} Appellant and his wife, Deana Jenkins, had been experiencing marital problems for some time. By May 20, 2004, Deana had told her friends Bernadette McElroy, Toni Heller, Neil Heller, Karen Osborne, Linda Merrell, Terri Harvey, and Carol Brown that she wanted to leave appellant and was trying to save enough money to rent her own apartment. Many of her friends were aware that Deana had originally planned to wait for the couple's daughter, Desirae, to graduate from high school in the spring of 2005. However, Deana decided she could no longer postpone her departure. She had told her friends she was going to leave once Desirae completed her junior year in the spring of 2004. Appellant ultimately became aware of Deana's plans on his own and communicated his awareness to the couple's mutual friends Toni Heller and Pierre Osborne. Appellant had also explained to the couple's adult son, Durrell, he and Deana may separate.
>
> {¶ 3} On the morning of May 20, 2004, Deana reported to her job at the Trumbull County Child Support Office. Appellant, an associate pastor at the New Jerusalem Fellowship Church, basketball coach, and a house painter, drove Desirae to school. Appellant was scheduled to offer the invocation and benediction at the Kiwanis Club's Scholastics Achievement Banquet that evening. However, between 10:30 a.m. and 11:30 a.m., appellant phoned Jan Vaughn, a fellow Kiwanis Club member and organizer of the event. Appellant explained he was unable to attend the banquet due to a "family emergency." According to Vaughn, appellant stated his nephew had been badly beaten and therefore appellant needed to be with his family.
>
> {¶ 4} On the same morning, appellant visited his niece, Terri Harvey, at her place of employment, Famous Hair, in Warren, Ohio. Terri had been at Appellant's and Deana's home the previous evening conversing with Deana. Appellant greeted Terri and inquired into the substance of the conversation Terri had with Deana. Appellant indicated their conversation and/or Terri's visit prevented him from having sex with Deana.
>
> {¶ 5} Later, between 2:00 p.m. and 3:00 p.m., appellant visited the Renaissance Place in Warren where he encountered two friends, Toni and Neil Heller. In the past, both Toni and Neil had helped Deana address and work through her marital problems. Appellant, aware of Toni's and Neil's influence, confided that he and Deana had made love the night before and thanked them for helping him "salvage their marriage."
>
> {¶ 6} That afternoon, Desirae finished school around 2:00 p .m. She came home and fell asleep until 5:00 p.m. when she was awoken by appellant.

-2-

Appellant told Desirae they were going to the mall to "look for basketball stuff, for the girl's [sic] basketball team." Durrell had planned to use appellant's green Ford Explorer to apply for summer jobs that evening, and so Durrell was going to drive appellant and Desirae to the home of appellant's parents where appellant could borrow his father's pick-up truck. Deana arrived home as the three were leaving. They arrived at the residence of appellant's parents and Durrell went to fill-out job applications. Once Durrell left, appellant suddenly changed the shopping plans he made with Desirae. He stated he had to attend a meeting at the Rebecca Williams Community Center and left in his father's pick-up truck, without Desirae, at sometime near 5:30 p.m. Desirae recalled appellant was dressed in a dark blue shirt, yellow and blue jogging pants, and black tennis shoes.

{¶ 7} In lieu of going to the community center, appellant returned home. Around 5:45 p.m., Bernadette McElroy stopped at the Jenkins' residence to drop off CDs for Durrell to copy. Bernadette knocked on the door and, when appellant answered the door, she asked to speak with Deana. Appellant told Bernadette that he and Deana were having a "family discussion." Bernadette noticed appellant was wearing "painter pants and a dress jersey top." After a brief exchange, Bernadette gave the CDs to appellant and began to walk away. As Bernadette was returning to her car, Deana peeked out of a window and asked if Durrell could use her as a job reference. Bernadette testified she left the Jenkins' residence at approximately 5:55 p.m.

{¶ 8} Shortly after Bernadette left, at 6:24 p.m., Deana made a panicked call to her friend Toni Heller. At the time, Toni was in Austintown Township, Mahoning County, watching her son at a track meet. Deana sounded strained and stated she needed someone at her home immediately. Before Toni could respond, Deana repeated her muffled entreaty and the phone went dead. Toni testified Deana sounded as though she could not breathe.

{¶ 9} Toni left the track meet en route to the Jenkins' residence in Warren. At 6:27 p.m., she frantically called Karen Osborne, a mutual friend. Karen testified "[Toni] said she received the phone call and Deana sounded as if she could hardly breathe and said someone needed to get to the house right away." Karen's telephone records revealed she tried to contact Deana's cell phone at 6:31 p.m. but received no response.  Toni also called her husband, Neil Heller, a Warren City Firefighter, who was on duty at the Atlantic Street Fire Station. Toni reached Neil shortly after 6:30 p.m. and asked him to go to Deana's aid. Another mutual friend, Carol Brown had been notified of the emergency call and, in turn, Carol called Bernadette. Bernadette, who was shopping at the time, left immediately and rushed to Deana's home.

{¶ 10} When Toni arrived back in Warren, Neil and Karen were already at the Jenkins' residence. Based on her phone records, Karen estimated she arrived at 6:40 p.m. The only car in the driveway was Deana's distinct BMW. Karen knocked on the door but received no response. She tried to open the front and back doors but both were locked. Toni was ultimately able to enter the home through an open bathroom window after which she unlocked the back door and Karen and Neil entered. While inside, Neil searched the basement while Karen and Toni looked upstairs. The house was ostensibly empty. The parties did not thoroughly go through all aspects of the home, but canvassed the main living areas of the house. During their search of the master bedroom, Toni noticed Deana's white purse and a pair of her shoes on the bed.

{¶ 11} In the meantime, appellant had again visited the Rebecca Williams Community Center. At 7:02 p.m., a program coordinator at the center, Alfie Burch, was locking the building when he noticed appellant sitting in a white pick-up truck. Appellant asked Mr. Burch if he had seen one Thurston Winbush, another employee of the community center. Mr. Burch indicated he was uncertain of Winbush's whereabouts and appellant quickly left the Center. Mr. Burch stated that appellant did not exit the truck and appeared to be in a rush. The men spoke for approximately 20 to 30 seconds.

{¶ 12} Appellant returned to his parents' home sometime after 7:00 p.m. to retrieve Desirae. When he arrived, Desirae testified appellant appeared very nervous, he was shaking and sweaty, as though "somebody just poured water on his shirt, or as if he were playing basketball, it was just soaked and just sweat dripping." Desirae recalled May 20, 2004 was not a hot day and she was not sweating. She further noticed her father had a scratch on his nose that was not there when he dropped her off at 5:30 p.m. and was wearing new white sneakers which had no laces. Appellant and Desirae drove toward the Eastwood Mall but did not reach their destination. Instead, they stopped at Burlington Coats on Route 422. In doing so, appellant sent Desirae into the store, and told her not to buy basketball apparel, but to look for clothes for herself.  While Desirae was in the store, appellant encountered an old friend, Jane Horne. Ms. Horne stated she and appellant typically have lengthy, interesting conversations. However, on that day, their conversation was brief and clipped. Ms. Horne noticed appellant was "sweating profusely" and wiped his face with his shirt three times during their brief exchange. After this conversation, appellant went into Burlington and paid for Desirae's clothes. According to the sales receipt, they left the store at 7:39 p.m.

{¶ 13} Appellant and Desirae returned to the home of appellant's father and mother.  Once they arrived, Terri Harvey, appellant's niece, communicated there was an emergency involving Deana. Appellant and Desirae left and returned to the Jenkins' residence. Upon arriving, appellant sent Desirae to search the downstairs while he checked upstairs. As appellant and Desirae were leaving the home, they encountered Karen Osborne. Karen told appellant about Deana's phone call to Toni. Appellant professed that Deana needed to be found and suggested they all should leave the house and search for her. Karen pointed out that someone should stay at the house in the event Deana returns or someone else stopped by the home. Appellant vehemently disagreed and advised that everybody had "to leave and go find her."

{¶ 14} Appellant returned to his truck and appeared to leave to search for Deana. As Karen drove away, she observed Toni coming down the street. She waited and the two women conversed about the situation. During the conversation, she noticed appellant had stopped, turned the truck around, and returned to the house. Toni and Karen surreptitiously followed appellant. As they approached the driveway, Karen heard a slamming noise coming from behind of the house. Appellant appeared and asked "what are you doing back here for?" As the women walked toward the backyard, appellant told them he already investigated the area and found nothing. Toni and Karen both asked appellant if they could look through the house again; however, appellant assured them he had already inspected the entire house, flatly remarking "she ain't in the house."

{¶ 15} As they stood in the driveway, Toni peered into a garbage can and noticed Deana's purse. This was the same purse Deana took to work that morning and the same purse Toni had seen in the master bedroom when she entered the house earlier that evening. Deana's cell phone, keys, and wallet were in the purse. Toni and Karen then entered the garage where they observed a large plastic tarp spread over the floor.  Karen, like Desirae and Jane, noticed appellant was perspiring heavily.

{¶ 16} Shortly thereafter, Bernadette arrived followed by Durrell, who was with Carol.  Durrell let everyone in the house and the search commenced anew. Durrell first searched his parents' room and then his sister's. Once he opened Desirae's closet, he discovered Deana, beaten and unconscious. Toni rushed into the room as Durrell yelled for his father. Deana fell from the closet to the floor whereupon Karen and Toni commenced CPR. The individuals observed Deana had various abrasions, bruises, and red marks on her face and neck; she had blood in her nostrils and her front tooth was chipped. They noticed Deana was clothed; however, her shirt had mismatched buttons and her skirt was askew and pulled up unusually high. Although Deana's legs were cold to the touch, her upper body was warm. As the women tried to resuscitate Deana, appellant came into the room and

violently knocked perfume bottles off a nearby dresser some of which landed on Deana. Neil eventually arrived and continued aggressive CPR. Neil noticed a scratch on appellant's nose that he did not see earlier when they spoke that day.

{¶ 17} Paramedics arrived and appellant told them Deana suffered from a medical condition that caused her throat to close. This proved to be false; Deana had no such condition and was in generally good health. After trying unsuccessfully for 16 minutes to resuscitate her, the paramedics took Deana to the hospital where she was pronounced dead. After an autopsy, Dr. Humphrey Germaniuk, the forensic pathologist for Trumbull County, concluded Deana died from strangulation between 6:30 p.m. and 8:30 p.m.

{¶ 18} While at the hospital, Detective Geoffrey Fusco attempted to interview appellant, but he was virtually unintelligible. Appellant simply reiterated that he and Deana had made love that day. After investigating the crime scene and the Jenkins' home, police officers could find no signs of forced entry.

{¶ 19} In the weeks following Deana's death, appellant provided the police with certain theories regarding what he believed happened on May 20, 2004. For instance, he asserted Deana had been the victim of stalking or threats at work; however, a search of Deana's work e-mail revealed nothing unusual or threatening. Further, Lt. Joe Marhulik reviewed old incident reports and canvassed the neighborhood after the homicide, but found no evidence of stalkers or suspicious persons.

{¶ 20} DNA samples were collected from Deana, appellant, and one William Fambro.  The samples were analyzed by Brenda Gerardi, forensic scientist with the Ohio Bureau of Criminal Identification and Investigation. She found semen in the victim's underwear and skirt. The non-sperm DNA was consistent with Deana's DNA and the sperm DNA was consistent with appellant's. DNA of both appellant and Deana was recovered from duct tape which was found in the same garbage can in which Toni found Deana's purse. Hair strands stuck to the duct tape matched Deana's DNA.

{¶ 21} Shawn Weiss, associate director for the forensic identity department at Laboratory Corporation of America Holdings, analyzed fingernail clippings from Deana's hands. After analyzing the fingernail clippings he found DNA under the right hand clippings. Weiss concluded he could not rule out appellant or appellant's relatives as a source of this DNA.  ECF Dkt. #8, Ex. 9; *State v. Jenkins*, No. 2006-T-0058, 2007 WL 2351003 at ¶¶2-21 (Ohio App. 11 Dist. Aug. 17, 2007), unreported.

**II. PROCEDURAL HISTORY**

    **A. State Trial Court**

On April 1, 2005, the Trumbull County, Ohio prosecuting attorney filed an indictment, charging Petitioner with one count of murder, for purposely causing the death of Deana Jenkins, in violation of Ohio Revised Code ("O.R.C.") § 2903.02(A) & (D). ECF Dkt. #8, Ex. 1.

On February 21, 2006, the state filed a notice of intent to use statements of the deceased pursuant to Rule 804(b)(6).[1] ECF Dkt. #8, Ex. 2. On February 24, 2006, Defendant filed Motion in Limine I, seeking to prohibit the state from eliciting testimony during the trial that Deana Jenkins was "planning on leaving the Defendant and/or divorcing him" and that she had moved her "time table" so that she would be initiating the divorce in a few weeks. ECF Dkt. #8, Ex. 3. On February 24, 2006, Defendant filed Motion in Limine II, seeking to prohibit the state from introducing medical records and communications protected by patient-physician privilege. ECF Dkt. #8, Ex. 4. Defendant specifically sought to exclude statements he made while seeking medical care on May 21, 2004. *Id*. On February 27, 2006, the trial court held a hearing on the motions and overruled Motion in Limine I and granted Motion in Limine II on consent of the state. ECF Dkt. #12 at 6-7, 8 (Trial Transcript, hereinafter "Tr.").

On February 27, 2006, the case proceeded to a jury trial and Petitioner was found guilty of Count I in the indictment. ECF Dkt. #8, Ex. 5. On April 4, 2006, the trial judge sentenced Petitioner to a prison term of fifteen years to life. *Id*.

    **B. Direct Appeal**

On May 4, 2006, Petitioner filed a notice of appeal from the trial court's conviction to the Ohio Court of Appeals for the Eleventh District. ECF Dkt. #8, Ex. 6. On January 18, 2007, Petitioner filed a brief in support of his direct appeal, raising the following assignments of error:

    I.    THE TRIAL [sic] ERRED AND ABUSED ITS DISCRETION BY PERMITTING NUMEROUS WITNESSES TO TESTIFY CONCERNING THE VICTIM'S INTENTION TO DIVORCE THE APPELLANT

    II.    THE TRIAL [sic] ERRED AND ABUSED ITS DISCRETION BY NOT GRANTING APPELLANT'S MOTION FOR A MISTRIAL BECAUSE THE AUDIENCE WAS DISRUPTIVE DURING THE TRIAL

-7-

> III. THE TRIAL [sic] ERRED AND ABUSED ITS DISCRETION AND VIOLATED APPELLANTS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY ALLOWING APPELLEE IN ITS CLOSING ARGUMENT TO IMPLY THAT APPELLANT'S SILENCE WAS AN INFERENCE OF GUILT
>
> IV. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

ECF Dkt. #8, Ex. 7 at i. On August 30, 2007, the Eleventh District Court of Appeals affirmed Petitioner's conviction. ECF Dkt. #8, Ex. 9.

### C. Supreme Court of Ohio

On October 3, 2007, Petitioner filed a notice and brief in support of jurisdiction in the Supreme Court of Ohio, raising the following propositions of law:

> I. THE TRIAL COURT ABUSES ITS DISCRETION BY ALLOWING HEARSAY TESTIMONY FROM THIRD PARTIES WHERE NO EXCEPTION TO THE RULE CONCERNING SUCH EXISTS
>
> II. A TRIAL COURT ABUSES ITS DISCRETION BY NOT PROTECTING A JURY FROM INTIMIDATION BY SPECTATORS DURING A TRIAL III. A TRIAL COURT ABUSES ITS DISCRETION BY PERMITTING AN APPELLEE TO INFER THAT AN APPELLANT'S SILENCE INDICATES GUILT
>
> IV. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

ECF Dkt. #8, Ex. 10, 11. On January 10, 2008, the Supreme Court of Ohio dismissed the appeal as not involving a substantial constitutional question. ECF Dkt. #8, Ex. 13.

### D. 28 U.S.C. § 2254 Petition

On March 23, 2009, Petitioner filed the instant petition for a writ of habeas corpus. ECF Dkt. #1. Petitioner has raised the following grounds for relief:

> **GROUND ONE:** THE TRIAL COURT ERRED AND VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY ALLOWING HEARSAY TESTIMONY FROM

          THIRD PARTIES WHERE NO EXCEPTION TO
          THE RULE CONCERNING SUCH EXISTS.

**GROUND TWO:**  THE TRIAL COURT ERRED AND VIOLATED PETITIONER'S RIGHTS BY NOT PROTECTING THE JURY FROM INTIMIDATION BY SPECTATORS DURING HIS TRIAL

**GROUND THREE:** THE TRIAL COURT ERRED AND VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY PERMITTING THE STATE TO INFER THAT PETITIONER'S SILENCE INDICATED GUILT

**GROUND FOUR:** PETITIONER'S CONVICTION IS A CONSTITUTIONAL VIOLATION AS IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

ECF Dkt. #1. On June 24, 2009, Respondent Robert Welch filed a Return of Writ. ECF Dkt. #8.  On March 30, 2010, Petitioner filed a traverse. ECF Dkt. #11.

On April 26, 2010, Magistrate Judge Limbert issued his Report and Recommendation (Docket #13), recommending that the Petition be dismissed, in its entirety, with prejudice.  On May 10, 2010, Petitioner filed his Objections to the Magistrate's Report and Recommendation. (Docket #14.)

**Standard of Review for a Magistrate Judge's Report and Recommendation**

The applicable standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to that report.  When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case de novo. FED. R. CIV. P. 72(b) states:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

**Conclusion**

This Court has reviewed the Magistrate Judge's Report and Recommendation *de novo*.

After careful evaluation of the record, this Court adopts the findings of fact and conclusions of law of the Magistrate Judge as its own. The Court hereby ADOPTS the Report and Recommendation of the Magistrate Judge (Docket #13) in its entirety. The Petition for Writ of Habeas Corpus filed by David J. Jenkins, pursuant to 28 U.S.C. § 2254, is hereby DISMISSED WITH PREJUDICE.

## Certificate of Appealability

Pursuant to 28 U.S.C. § 2253, the Court must determine whether to grant a certificate of appealability as to any of the claims presented in the Petition. 28 U.S.C. § 2253 provides, in part, as follows:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In order to make "substantial showing" of the denial of a constitutional right, as required under 28 U.S.C. § 2255(c)(2), a habeas prisoner must demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issue presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983).)

Where a district court has rejected the constitutional claims on the merits, the petitioner must demonstrate only that reasonable jurists would find the district court's assessment of the

-10-

constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484. Where the petition has been denied on a procedural ground without reaching the underlying constitutional claims, the court must find that the petitioner has demonstrated that reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right *and* that reasonable jurists could debate whether the district court was correct in its procedural ruling. *Id.* "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

For the reasons stated in the Magistrate Judge's Report and Recommendation, a reasonable jurist could not conclude that dismissal of the Petition is in error or that Petitioner should be permitted to proceed further. Further, to the extent that Petitioner's claims were also rejected on the merits, reasonable jurists could not find the assessment of Petitioner's constitutional claims to be debatable or wrong. Accordingly, the Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

                                                  s/Donald C. Nugent
                                                  DONALD C. NUGENT
                                                  United States District Judge

DATED: May 12, 2010